Good morning, ladies and gentlemen. We have five cases on the calendar this morning. Three patent cases and two veterans' appeals, the latter being submitted under briefs and will not be argued. The first case is DURAMED, now known as TAVA v. PADDOCK, 2010-14-19. Mr. Brommer. Good morning, Your Honors, and may it please the Court. Today, this Court reviews the summary judgment of the District Court that found that a particular equivalent was foreseeable and therefore outside the scope of the doctrine of equivalence. That judgment was in error for two reasons. First, the District Court misapplied the standard for foreseeability because it took a particular sentence from this Court's Festo 10 decision out of context and therefore applied a per se rule that if an equivalent was identified in the prior art or mentioned in the prior art, it was, as a matter of law, foreseeable. Your Honor, we're talking about a specific polyvinyl alcohol coating, OPA-DRY-AMB, that Paddock used. And in terms of those mentions, I think the main reference that was at issue below was a PCT application applied for by ColorCon. That PCT application noted that all of the previous attempts to make a PVA coating for pharmaceutical applications had been unsuccessful. Back up a moment. Don't we have to assume that someone skilled in the art would have known of that PCT application? Certainly, if we were dealing with anticipation or obviousness, it's clear that we would assume that a person skilled in the art would know of all the prior art, right? Certainly, this Court's case law goes to that side, that if it's in the prior art, then a person of ordinary skill would have known of it. Now, whether that was the original intention of the Supreme Court in creating the foreseeability exception, or a way of rebutting the presumption, I think is less clear. But isn't our in bank, in festo, it seems to me, in discussing foreseeability, we made it pretty clear that you would assume that a person of skilled in the art would know of all the prior art. I think you're correct, Your Honor, that the assumption would be that a person of ordinary skill or a reasonable applicant, however you want to phrase it, would know of that PCT application, but there is still a disputed question of fact as to what that PCT application actually taught, particularly in conjunction with the other information available on the record. Doesn't it teach exactly the same coding that we're dealing with here? It did teach the OPA-Dry A and B coding, but the important fact was that it also taught that all previous PVA-based coatings had been unacceptable. They were too tacky, their plasticizers compromised their moisture barrier properties and made them unsuitable for pharmaceutical applications. And we have expert testimony on the record that because the PCT application didn't include any data to show that the OPA-Dry A and B coding actually worked to overcome these disadvantages of prior PVA-based coatings, a person of ordinary skill in the art wouldn't have accepted or believed that OPA-Dry A and B would have been usable in the pharmaceutical context. And that's the context that this Court has to look at the equivalent through the lens of. Whether this OPA-Dry A and B coding would have been understood at the time, December 1998, when the amendment was made, to be usable with a pharmaceutical composition that involved a moisture-sensitive active pharmaceutical ingredient like conjugated estrogens. And as I mentioned, the inventor testimony we have available in the record shows that a person of ordinary skill would have required stability data. Data showing whether the moisture-sensitive active pharmaceutical ingredient actually degraded in a tablet that was coated with OPA-Dry. The irony is that they made it work, and they're using PVA, right? Well, they certainly made it work, and this goes... You're suing them under a claim that says the moisture barrier comprises ethyl cellulose. Correct, Your Honor. And this goes really to the issue that several of this Court's previous decisions have gone to, which is the issue of before and after developed technology. And this happens to be a technology that was right on the cusp of development at the time of the amendment. So the PCT application we're talking about was published in 1996. What I'm puzzled about, I mean, the PCT application describes exactly what we're talking about. Same composition, same use. So what is there to see? Why is there no foreseeable outcome? Well, what's left is the factual dispute about whether a person of ordinary skill in the art would have read that PCT application and from that actually taken away from it that OPA-Dry A and B could have been used as the coating in an actual pharmaceutical composition. Based on the language in the PCT application itself disparaging previous PVA-based coatings and the fact that... Well, what about the coating that was claimed in the PCT application? It's the same one. It is, but it was never tested. There's no test data provided in the PCT application. That test data to show whether it actually worked would only have come later. And even the later data, and there is some dispute about whether that data is in the prior art, shows mixed results. Confusing data that, you know, on one side of the scale it may have suggested, you know, there were certainly conclusions in some abstracts that suggest that OPA-Dry A and B could have been used as a moisture barrier coating. But in those same abstracts it provides statements that suggest that various characteristics of this coating, such as sorption, desorption, hysteresis, and other things, would have potentially made it unsuitable for pharmaceutical applications. There are a lot of references here. There's a German patent, Bergen-Mannheim, mentioning PVA for this purpose. There's a manufacturing chemist document. There's a paper by Weitman, Jordan. There's a whole lot of stuff that uses PVA. Well, Your Honor, and I think that goes to two different things. The Grappenbacher patent from 1976, that doesn't actually discuss the use of PVA as a moisture barrier coating. That actually talks about the use of PVA either as a sustained release agent, and this court has previously dealt with the use of PVA as a sustained release agent in the Smith-Klein case, which I'll discuss in a moment, or as a subcoat to help apply the actual moisture barrier coating. So that's not actually the use of… What about the Jordan reference? The Jordan reference, and this is the May 1995, I believe, abstract. May 1995. Correct. So that doesn't actually describe Opidry-AMB. It describes Colorcon's attempts to make a PVA-based moisture barrier coating and the problems it ran into using other plasticizers like polyethylene glycol 400 or 4000. And from that development effort, they later found that soya lecithin might overcome these disadvantages. Now, those later efforts were also discussed in abstracts, but the main point is there was no evidence on the record to show that these abstracts were part of the prior art. That's kind of the fundamental factual question that needed to be resolved at summary judgment. Now, the district court ignored those abstracts, and I think while that reaches the correct end, it did so for the wrong reasons. The district court applied a per se rule that evidence that a particular equivalent was unsuitable for the claimed invention was irrelevant. It didn't matter. As long as the equivalent was mentioned in the prior art, according to the district court, it was foreseeable. Well, what did that case suggest that there has to be equivalent suitability? Well, I think this court did it in the companion cases of Glaxo versus Apotex and SmithKline versus Excel. In Glaxo, this court said it scoured the record for any evidence of a verifiable scientific reason that the equivalent in question there was not suitable for use with the claimed invention. And only after it found no such evidence did it allow summary judgment to be affirmed. On the flip side, in the SmithKline case, where the same patent was at issue, the same limitation was at issue, but a different equivalent was being considered, the court didn't find enough evidence to sustain summary judgment, and therefore reversed it. It says that in order to have it be foreseeable, you've got to prove foreseeability, right? Well, I think that the Glaxo case does, because the only way that summary judgment was affirmed there is after finding that there was no verifiable scientific reason to show unsuitability of the equivalent for the claimed invention. And I think that the court's FESTO decision itself has language to the same end. In the FESTO 2003 decision, this court noted that the original purpose of the sleeve that was at issue there was to hold certain magnets in place. And it noted that the equivalent in question, an aluminum sleeve, was probably not going to be unforeseeable because aluminum was a well-known material. But it remanded the case anyway for further trial on that issue by the district court, particularly because it wanted to give the patentee an opportunity to provide evidence to show whether it would have been unforeseeable that aluminum could be used in that particular invention with those particular rare-earth magnets. Now, of course, when the case came back up to this court in 2007, FESTO had changed somewhat its argument. It was looking at a different purpose. So instead of looking at the original purpose of the sleeve, which was to hold the magnets in place, it was now arguing that because the sleeves were magnetizable post-amendment, their actual purpose was to provide some shielding. And this court, I think, correctly found that that purpose, the post-amendment purpose, wasn't properly the focus of the foreseeability inquiry. Here, the claim's original purpose and the claim's post-amendment purpose was the same. It was to provide a moisture barrier coating, or the limitations purpose at issue was the same, and that was to provide a moisture barrier coating for a pharmaceutical product that had a moisture-sensitive active pharmaceutical ingredient, specifically conjugated estrogens. So here… But isn't that really the opposite to your argument, that if the PVA was foreseeable as a moisture barrier, isn't that sufficient? No, it isn't, Your Honor. Why not? Because moisture barrier coatings are used in a number of applications, and only some coatings would be suitable for a pharmaceutical application. Does it have to be the specificity with the ethyl…what was it, ethyl cellulose? Does it have to be that specific in order to be a proper moisture barrier, foreseeable as a moisture barrier? Well, I don't think that the prior art would have to show that a PVA moisture barrier coating was equivalent, in terms of the function-weight result test, to an ethyl cellulose moisture barrier coating, and I think this Court's Festo 10 decision pretty clearly resolved that. But the factual issue, the factual dispute here, and what is set up by the expert testimony on the record, is that in order for a person of ordinary skill in this art to believe that a PVA-based coating could be used with a pharmaceutical composition, they would have to see stability data, data that showed that when you put the coating on an actual tablet with a moisture-sensitive API in it, the API wouldn't degrade under certain stability testing conditions. So that's really the question that the District Court should have been trying to resolve, but it did not get to that point because it simply applied its personal view. I see that I'm in my rebuttal time. Thank you, Your Honor. If you please, the Court. Good morning, Your Honors. Ed Haug for the appellee. This is a very straightforward case of prosecution history estoppel, and why in this instance it clearly precludes reliance on the doctrine of equivalence is nothing unusual about this case. In our view, for sure. The patentee here, DuraMed, made a deal with the Patent Office. They filed their original Claim 1. It seems to boil down to, as I understand it, they admit that a person skilled in the art were known for PCT applications. They admit that the PCT application claims the same coating, but they say the problem is it wasn't known to be suitable for this kind of application. So is there such a requirement? No, there's no requirement under FESTO that it be known to be suitable for the use as a moisture-barrier coating comprising ethyl cellulose, the post-amendment claim. I think what we have to look at is, is it suitable, not suitable, is it foreseeable for use as a moisture-barrier coating, which it clearly is. All those references that Your Honors have already asked about do talk about just that, PVA being used as a moisture-barrier coating, a film coating. OpaDry-AMB is aqueous moisture barrier. It's right in the trade name that they used for this product that was commercially sold, commercially sold by Colorcon prior to the date we're talking about, the date of the amendment here. It was also published in technical articles. In fact, two of those articles that we cite were authored by expert Buckton, who was DuraBed's expert in this case. What about if a PCT application is self-sufficient? Yes, I think it is. And Judge Sand found that that, and he also relied on a few other references, prior art references to find the support clearly for why it was foreseeable. He didn't rely on four of them. He didn't say they were not in evidence. He just didn't rely on them because there was an objection at the hearing. Interesting, if you look at column 10 of the patent, they list a lot of alternatives to ethyl cellulose. Obviously, when they cut back to ethyl cellulose, they eliminated all those. But PVA isn't there, curiously. How does that relate to foreseeability? They didn't foresee it, but they listed six, seven lines of other alternatives. I think the standard test is not whether or not the inventors here saw it to be foreseeable, particularly not when they wrote their patent application. The test, the legal test, is whether a person of ordinary skill in the art would find the alleged, not only the alleged equivalent, but PVA in this instance would be foreseeable. And that is why we go to these prior references, all of which are before the amendment was made a few years after the filing of the application. So, I think that may very well be correct, yes. But I don't believe it was in the application, as is correctly noted by Your Honors. And in the briefing, to the extent we follow the briefing, I believe it's being urged that the standard should be suitability. I don't believe there's any legal support whatsoever. We haven't found a case that supports a doctrine of suitability in order to find foreseeability. I mean, suitability equals foreseeability. We don't know really what it is suitable for. And so, we just haven't found any legal authority to support their position, whereas I think Festo and all the other cases cited in our briefs do support our position that doctrine of equivalence does not apply in this case because of the prosecution history estoppel that occurred. I really have nothing more to add to the briefing, unless Your Honors have any questions. Does it get penalized by surrendering a felony? Thank you. Thank you. Mr. Brahman, do you have anything to report? I do, Your Honors. Two points. The first is whether there's any case law to support this suitability requirement. And I think SmithKline is clear. In SmithKline and Glaxo, the two cases, the Court considered prior art that disclosed the equivalent in question, and that prior art was before the Patent Office in the prosecution history. But in SmithKline, the Court remanded the case for further proceedings because it wanted the patentee to have an opportunity to show whether that particular sustained release agent, which coincidentally was PVA, would have been known to be a suitable equivalent for use in that particular invention, which was for use with bupropion. The case is talking about known in the field of the invention. They don't talk about known for use in this particular invention. Well, Your Honor, it talks about it certainly being known in the field of the invention, but what it has to be known to do is to be usable with that invention, at least as the invention existed, at least as it existed pre-amendment, correct? That would validate the patent. I don't believe so, Your Honor. Are you talking about an anticipation? Well, no, I don't believe that it has to be specifically with conjugated estrogens. But, for example, if there's no evidence in the record that conjugated estrogens are special compared to other moisture-sensitive active pharmaceutical ingredients, I don't think there has to be a specific reference that says use PVA with conjugated estrogens. What do you mean by suitability? I mean, as Judge Lori points out, it was known to use it with this particular invention, with this particular estrogen compound. That would be anticipatory. So what do you mean by suitable? I mean that it would have to have been known to have been usable with pharmaceutical compounds that were moisture-sensitive. This particular coating would have to be known to be usable with moisture-sensitive pharmaceutical compounds. Because that's what this invention was, a pharmaceutical composition with a moisture-sensitive active pharmaceutical ingredient. And in SmithKline, this Court specifically asked the patentee, asked the remanded so that the patentee could get an opportunity to show So the application doesn't show that it would be suitable as a moisture-bearing? It doesn't show it to the satisfaction of a person of ordinary skill in the art. That, at least from a factual standpoint, and this is a summary judgment case, there was expert testimony to show that a person of ordinary skill would not have accepted that the lack of data in the PCT application would have overcome the statements about previous PVA-based coatings being unacceptable in pharmaceutical compositions. There was no stability testing, stability data in the PCT application that would have shown that Opa-Dry A and B was suitable for that purpose. The other question that Judge Lurie mentioned was, does the subjective knowledge of the inventors matter? I think that's kind of where Judge Lurie's question was going. And while it may not be dispositive, it certainly is one fact that would suggest what the outcome should be on an objective foreseeability analysis. Thank you. Thank you, Mr. Cameron. We'll take some more questions.